UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| ———————————————— X | |
| THE NATIONAL ACADEMY OF TELEVISION ARTS AND SCIENCES, INC. and ACADEMY OF TELEVISION ARTS & SCIENCES, | : : : |
| | : Civil Action No. 1:20-cv-07269 |
| Plaintiffs / Counterclaim Defendants, | : |
| | : **ANSWER,** |
| -v- | : **AFFIRMATIVE DEFENSES** |
| | : **and COUNTERCLAIMS** |
| MULTIMEDIA SYSTEM DESIGN, INC. | : |
| | : |
| Defendant / Counterclaim Plaintiff, | : |
| | : **JURY TRIAL DEMANDED** |
| JASON GOODMAN, | : |
| | : |
| Counterclaim Plaintiff. | : |
| | : |
| ———————————————— X | |

Defendant / Counterclaim Plaintiff MULTIMEDIA SYSTEM DESIGN, INC. ("Multimedia") and Counterclaim Plaintiff JASON GOODMAN ("Goodman"), for their Answer, Affirmative Defenses, and Counterclaims, allege as follows on personal knowledge as to matters relating to them, and on information and belief as to all other matters.[1]

## ANSWER TO THE COMPLAINT

1.       The allegations of Paragraph 1 are admitted.

2.       Admitted that the EMMYs were first awarded in 1949.  The remaining allegations of paragraph 2 are denied.  It is specifically denied that the Emmys have "only grown in stature

---

[1]       Contemporaneous with the filing of this Answer, Plaintiff is also filing a Motion to Dismiss the First through Sixth Causes of Action (various Federal and state copyright and trademark claims) alleged in the Complaint.  Plaintiff is not moving to dismiss the Seventh Cause of Action (a state law libel claim) at this stage.

and fame."  According to *New York Magazine's* Vulture, an online trade publication, the 2020 Emmy Awards "were the least-watched ever."  Below are prominent trade publications documenting the Emmy Awards' disappearance from cultural relevance:







3.      Plaintiff denies knowledge and information ("DKI") sufficient to admit or deny the allegations of paragraph 3.

4.      Admitted that on or about June 12, 2020, Plaintiff posted a video entitled JOHN CULLEN PRESENTS THE CRONY AWARDS FOR INTERNATIONAL EXCELLENCE IN COVID-19 RESPONSE (the "Broadcast") on YouTube and other platforms that included a fleeting reference to a parody image of the EMMY statuette holding a widely recognized medical illustration of the COVID virus (the "Crony Graphic"), which appeared at the start of the Broadcast for 10-15 seconds as part of the pre-broadcast thumbnail image that is displayed immediately before the Broadcast begins.  The content of the Broadcast highlighted countries that had the lowest number of Covid-19 deaths as reported by WHO, CDC and Johns Hopkins, despite having populations much larger than New York and other U.S. States and in many cases being much

closer to Wuhan China.  No actual awards were manufactured or disseminated.  No individual or

nation was actually nominated for anything. The Broadcast was not actually an award show.  It

was a serious examination of WHO and CDC data that employed parody in part to punctuate the

irony revealed by these facts.  The remaining allegations of paragraph 4 are legal conclusions

requiring no response and are otherwise denied. [2]

**The Pre-Broadcast Thumbnail Image Displayed For
10-15 Seconds Before The June 12, 2020 Broadcast**



5.       DKI paragraph 5.

6.       DKI paragraph 6.

---

[2]       The video is accessible at BitChute:  https://www.bitchute.com/video/MQ2xH7Z3584/

7.      Denied.    For clarification, Jason Goodman – who is being empleaded as a Counterclaim Plaintiff – is the sole owner of Multimedia System Design, Inc. ("Multimedia"). *Crowdsource The Truth* is not a "DBA" of any company; it is the trademarked name of the news, information, and entertainment talk show that Mr. Goodman produces several times a day and disseminates through two YouTube channels and numerous other platforms.   Mr. Goodman's YouTube channels, named "Jason Goodman" and "Crowdsource The Truth 2" disseminate *Crowdsource The Truth* content and together have 140,000 subscribers.   *Crowdsource The Truth* is not a legal or jural entity.   Multimedia performs back-office functions for Mr. Goodman's media business.   Screenshots of Mr. Goodman's YouTube channels are included below:





8.      Paragraph 8 contains legal conclusions that require no response.  Defendants have no objection to the Court's jurisdiction of this matter.

9.      Paragraph 9 contains legal conclusions that require no response.  Defendants have no objection to the Court's jurisdiction of this matter.

## THE EMMY STATUETTE

10.     DKI paragraph 10.

11.     DKI paragraph 11.

12.     DKI paragraph 12.

13.     DKI paragraph 13.

14.     DKI paragraph 14.

15.     DKI paragraph 15.  Plaintiff is aware that 2019 was the lowest-rated Emmys (6.9 million viewers) in history, and that 2020 ratings collapsed further (6.1 million viewers).

16.     DKI paragraph 16.

17.     DKI paragraph 17, except the legal conclusion ("unlawful acts") is denied.

18.    DKI paragraph 18.

19.    DKI paragraph 19.

20.    DKI paragraph 20.

21.    DKI paragraph 21.

22.    DKI paragraph 22.

23.    The allegations of paragraph 23 are denied.  Plaintiff routinely acquiesces in fair use of its statuette far more provocative than occurred here.  As an example, the EMMYs approved an image of the EMMY statuette hoisting heavenward a sex toy, to wit, the Pirates Pendant Vibe Necklace.  See below:



24.    DKI paragraph 24.

## DEFENDANT AND ITS WRONGFUL ACTS

25.     Paragraph 25 is denied.  Please refer to Paragraph 7, above.

26.     Paragraph 26 is denied.  Crowdsource The Truth is not a DBA of any company.

Please refer to Paragraph 7, above.

27.     Paragraph 27 is admitted.  *Crowdsource The Truth* content has historically been

distributed through a variety of platforms including those mentioned.

28.     Paragraph 28 is denied.  By further response, in January 2020, Ricky Gervais hosted

the Golden Globes, where he gave a monologue that went viral online.  The most remarked upon

bit in Mr. Gervais' set centered upon the conspiracy theory that Jeffrey Epstein "obviously didn't

kill himself."  The EMMYs were so appalled by Mr. Gervais trafficking in conspiracy theories

that they nominated his performance for an EMMY.[3]

---

[3]     The Ricky Gervais monologue can be found at:  https://youtu.be/sR6UeVptzRg (accessed
October 10, 2020).  The Epstein joke starts at 2:55.



29.     Paragraph 29 is denied.

30.     Paragraph 30 is denied.

31.     Paragraph 31 contains legal conclusions requiring no response and is otherwise denied.  By further response, Mr. Goodman's use of the so-called Infringing Image (the "Crony Graphic") falls squarely within fair use and was *de minimis*.

32.     Paragraph 32 is denied with respect to Defendants' self-congratulatory description of the EMMY Awards which continue to decline into obscurity as evidenced by record-low ratings.

33.     DKI paragraph 33.

34.     DKI paragraph 34.

35.     It is admitted that Plaintiff's complaint to YouTube resulted in the allegedly offending video dated June 12, 2020 being removed from the platform. Paragraph 35 is denied insofar as it alleges that YouTube had any obligation to take down the Crony Graphic, which was

squarely in the realm of fair use.  By way of further response, Mr. Goodman presented YouTube's Legal Department with the screenshot of the Crony Graphic and an email detailing facts and assertions related to these proceedings.   YouTube agreed that the Crony Graphic was not a violation of the terms of service and that NATAS' response to Goodman's counterclaim was insufficient to maintain the embargo on Goodman's YouTube channel. YouTube promptly removed the limitations that had been placed on Mr. Goodman's channel.  YouTube specifically stated, "if this matter resolves with a court judgment in your favor, please feel free to share a copy of the decision with us, and we may evaluate further at that point."

36.     Paragraph 36 is denied

37.     Paragraph 37 is denied

38.     Paragraph 38 is denied

39.     Paragraph 39 is denied

40.     Paragraph 40 is denied

41.     Paragraph 41 is denied

42.     Paragraph 42 is denied

43.     Paragraph 43 is denied.  We refer to the actual recording of the challenged statement – a 3-minute segment plucked out of a 100-minute unscripted conversation that can be found online at https://youtu.be/3heNmyUlZj8.

44.     Paragraph 44 is denied

45.     Paragraph 45 is denied.


### INJURY TO THE PUBLIC AND THE TELEVISION ACADEMIES

46.     Paragraph 46 is denied.

47.     Paragraph 47 is denied.

48.    Paragraph 48 is denied.

49.    Paragraph 49 is denied.

50.    Paragraph 50 is denied.


**FIRST CLAIM FOR RELIEF**
**Copyright Infringement Under**
**17 U.S.C. § 101 *et seq.***

51.    Paragraph 1-50 are incorporated by reference.

52.    Paragraph 52 is denied.

53.    Paragraph 53 is denied.   In further response, Defendant's use of the so-called

infringing image was fair use and *de minimis*.

54.    Paragraph 54 is denied.

55.    Paragraph 55 is denied.

56.    Paragraph 56 is denied.

57.    Paragraph 57 is denied.

58.    Paragraph 58 is denied.


**SECOND CLAIM FOR RELIEF**
**Trademark Dilution Under**
**Section 43(c) of the Federal Trademark Dilution Act, 15 U.S.C. § 1125(c)**

59.    Paragraph 1-58 are incorporated by reference.

60.    Paragraph 60 is denied.

61.    Paragraph 61 is denied.

62.    Paragraph 62 is denied.

63.     Paragraph 63 is denied.


## THIRD CLAIM FOR RELIEF
### Trademark Infringement Under
### Section 32(1) of the Lanham Act, 15 U.S.C. § 1114(1)

64.     Paragraph 1-63 are incorporated by reference.

65.     Paragraph 65 is denied.


## FOURTH CLAIM FOR RELIEF
### Trademark Infringement, False Designation
### of Origin, Passing Off, and Unfair Competition
### Under Section 43(a)(1)(A) of the Lanham Act, 15 U.S.C. § 1125(a)(1)(A)

66.     Paragraph 1-65 are incorporated by reference.

67.     Paragraph 67 is denied.


## FIFTH CLAIM FOR RELIEF
### Trademark Infringement Under New York Common Law

68.     Paragraph 1-67 are incorporated by reference.

69.     Paragraph 69 is denied.


## SIXTH CLAIM FOR RELIEF
### Trademark Dilution Under N.Y. Gen. Bus. Law § 360-l

70.     Paragraph 1-69 are incorporated by reference.

71.     Paragraph 71 is denied.

72.     Paragraph 72 is denied.

73.     Paragraph 73 is denied.

74.     Paragraph 74 is denied.


**SEVENTH CLAIM FOR RELIEF**
**Libel Per Se and/or Libel Per Quod Under New York Common Law**


75.     Paragraph 1-74 are incorporated by reference.

76.     Paragraph 76 is denied.  Under applicable New York law, a libel claim requires the

Plaintiff to state verbatim the challenged statement – not just paraphrase the Plaintiff's subjective

interpretation of the words.   Quoted below is the verbatim challenged statement identified in

paragraph 43 of the EMMYs complaint (the "Goodman Statement"):

> I've been talking a lot about the Emmys lately and how the President of the National Academy of Television Arts and Sciences personally has struck a video on the Jason Goodman YouTube channel that right now is preventing 114,000 subscribers from being notified about this video.  It's going to reduce the number of people who hear your message about Cuomo, who hear Carter Page's message about his book and the things that he was talking about.
>
> **And it was a remarkably strategic attack from a guy who used to be a principal of well a highly placed executive at Twitter who was in charge of news politics and elections.** Now Twitter ostensibly started as some stupid app on the phone that grew to such prominence.  But I don't think so. I think they had designs to do something with it from the beginning.
>
> And you know Charles, I've, I've, learned something today that I really want to share with everybody that adds even more intrigue to this story. **And I'm not suggesting anything,** but we've spoken about how the president of television's father was a news correspondent for CBS and ABC but I did not realize that he was the individual who told the world that Lee Harvey Oswald is dead.  He was in the Dallas police station when Oswald was shot. And he featured very prominently in the reporting on the JFK assassination.

Now I know a lot of people who watch Crowdsource The Truth are aware of the Frank Church Senate hearings where he was investigating the CIA in 1975 or, 1975, well after this.  And **William Colby, the director of the CIA, admitted to Operation Mockingbird.**  He declassified it.  He said that they were paying news people.  **I don't know if Roger Sharp was named as a participant in that program** but it certainly seems curious and it takes me back to what you were raising about these dynastic families.  Is this a situation where someone puts pressure on somebody and says look either you can be marginalized and have the 1963 equivalent of your YouTube channel being struck so that you never get off the ground or you can tell stories that we want you to tell you're going to win many Emmys?  You're going to rise to prominence and maybe someday your son could run the Emmys?  **I'm not saying that's what happened.**

But we can **hypothesize** about a situation where perhaps that would happen and this guy Adam Sharp who struck the channel, he's giving out news Emmys, sports Emmys.  **So I can imagine a world** where a Jason Goodman is working at NBC News reporting on how the Dallas police tested Lee Harvey Oswald's hands and there was no gunshot residue on his face, no indication that he fired a rifle that day.  If Lee Harvey Oswald had ever had a trial and evidence was fairly presented he would have surely been exonerated.  But reporting like this made sure that he's gone down in history as the murderer of JFK and perhaps that secret is being jealously protected to this day because disciples of that regime – the Bushes then the Clintons then the Obamas to today need to be protected by these dynastic political and media families.  Because these award shows, that is where the politics of entertainment meet.  **And I'm just saying there's something to look at here.**

The Court can simply watch the clip in question:   https://youtu.be/3heNmyUlZj8?t=5032   Mr. Goodman's words were clearly identified and phrased as speculation, rhetorical questions, and trying to connect dots.  Speculation and raising questions are by definition non-libelous.

Lastly, it bears noting that Plaintiff's description of Operation Mockingbird is incorrect. The EMMYs say that Operating Mockingbird was "an alleged conspiracy by the CIA to control people's minds using torture and psychoactive drugs and related murder allegations."  This description is factually incorrect and could be interpreted as The EMMYs making its own attempt to spread conspiracy theories and disinformation. Operation Mockingbird was a CIA program,

acknowledged by the CIA in 1976 before the Church Committee.  For counsel's edification, annexed as **Exhibit A** is a reprint of Carl Bernstein's 25,000 word article in *Rolling Stone* dated October 20, 1977 entitled "The CIA And The Media."  This is a matter of historical fact and cannot be waved away as a conspiracy theory.  It begins:

### THE CIA AND THE MEDIA

*How Americas Most Powerful News Media Worked Hand in Glove with the Central Intelligence Agency and Why the Church Committee Covered It Up*

BY CARL BERNSTEIN

In 1953, Joseph Alsop, then one of America's leading syndicated columnists, went to the Philippines to cover an election. He did not go because he was asked to do so by his syndicate. He did not go because he was asked to do so by the newspapers that printed his column. He went at the request of the CIA.

Alsop is one of more than 400 American journalists who in the past twenty-five years have secretly carried out assignments for the Central Intelligence Agency, according to documents on file at CIA headquarters. Some of these journalists' relationships with the Agency were tacit; some were explicit. There was cooperation, accommodation and overlap. Journalists provided a full range of clandestine services—from simple intelligence gathering to serving as go-betweens with spies in Communist countries. Reporters shared their notebooks with the CIA. Editors shared their staffs. Some of the journalists were Pulitzer Prize winners, distinguished reporters who considered themselves ambassadors without-portfolio for their country. Most were less exalted: foreign correspondents who found that their association with the Agency helped their work; stringers and freelancers who were as interested in the derring-do of the spy business as in filing articles; and, the smallest category, full-time CIA employees masquerading as journalists abroad. In many instances, CIA documents show, journalists were engaged to perform tasks for the CIA with the consent of the managements of America's leading news organizations….

The full article is annexed as **Exhibit A**.

Adam Sharp's father, Roger Sharp, was the reporter on the ground for ABC's coverage of the Kennedy Assassination[4] and was a highly respected TV news correspondent until his death in 1986 at the age of 50.  Mr. Goodman means no personal affront to Adam Sharp.  However, as the public becomes aware of the manipulation being practiced upon them, the public interest demands a robust discussion of whether, in fact, the CIA or any other actors have been manipulating our news.  Mr. Goodman is grateful to the EMMYs for granting him subpoena power to investigate these important issues.

77.   Paragraph 77 is denied and reference is made to the Goodman Statement.

78.   Paragraph 78 is denied.

79.   Paragraph 79 is denied.

80.   Paragraph 80 is denied.

---

[4]      https://youtu.be/l70vRUTohug

## **AFFIRMATIVE DEFENSES**

First Affirmative Defense – the "Crony" graphic was fair use and/or *de minimis.*

Second Affirmative Defense – the "Goodman Statement" and "Crony" graphic were protected speech under the First Amendment to the United States Constitution, precluding civil liability.

Third Affirmative Defense – the Goodman Statement concerned the activities of Roger Sharp, who has been deceased since 1986, and therefore cannot sue for defamation.  Rich v. Fox News Network, LLC, 939 F.3d 112, 125 (2d Cir. 2019) ("Because Seth is dead, no defamation claim can be brought in his name.").

Fourth Affirmative Defense – Plaintiffs have failed to state a valid cause of action.

Fifth Affirmative Defense – Plaintiffs' inequitable conduct precludes them from obtaining equitable relief under the doctrine of unclean hands.

Sixth Affirmative Defense – Plaintiffs' libel claim is barred on the ground that truth is an absolute defense to a defamation claim.  See Rinaldi v. Holt, Rinehart & Winston, Inc., 42 N.Y.2d 369, 379–80, 397 N.Y.S.2d 943, 366 N.E.2d 1299 (1977) ("At common law, the libelous statement was presumed to be false and the defendant carried the burden of pleading and proving, in defense, that the statement was true.").

Seventh Affirmative Defense – Plaintiffs' libel claim is barred because it was clearly formulated as opinion and supposition, and because Mr. Goodman explicitly and repeatedly cautioned the listener that he was not, in fact, making any factual assertion regarding Mr. Sharp or his father.

Eighth Affirmative Defense – Plaintiffs trademark and copyright claims are barred by res judicata because YouTube has already considered and rejected the EMMYs claim that the Crony graphic violated YouTube terms of service relating to copyrighted material.


Dated:       New York, New York
             October 13, 2020


                                        JOHN H. SNYDER PLLC


                               By: _____
                                        John H. Snyder
                                        555 Fifth Avenue, Suite 1700
                                        New York, New York 10017
                                        Tel:  (917) 292-3081
                                        Email:  john@jhs.nyc

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| THE NATIONAL ACADEMY OF TELEVISION ARTS AND SCIENCES, INC. and ACADEMY OF TELEVISION ARTS & SCIENCES, | : <br> : <br> : |
| Plaintiffs / Counterclaim Defendants, | :    Civil Action No. 1:20-cv-07269 <br> : |
| -v- | :    **COUNTERCLAIMS** <br> : |
| MULTIMEDIA SYSTEM DESIGN, INC. | : <br> :    **JURY TRIAL DEMANDED** |
| Defendant / Counterclaim Plaintiff, | : |
| and | : |
| JASON GOODMAN, | : |
| Counterclaim Plaintiff. | : |

Defendant / Counterclaim Plaintiff MULTIMEDIA SYSTEM DESIGN, INC. ("Multimedia") and Counterclaim Plaintiff / Third Party Plaintiff JASON GOODMAN ("Goodman") (together, "Crowdsource" or "CC Plaintiffs"), for their Counterclaim / Third Party Complaint against Plaintiff / Counterclaim Defendants THE NATIONAL ACADEMY OF TELEVISION ARTS AND SCIENCES, INC. ("NATAS") and ACADEMY OF TELEVISION ARTS & SCIENCES ("ATAS") (together, "the EMMYs"), allege on personal knowledge as to matters relating to them, and on information and belief as to all other matters:

1

## STATEMENT OF THE CASE

1.      Jason Goodman and Multimedia System Design, Inc. are asserting various counterclaims against the EMMYs for tortious interference, anti-SLAPP and certain declaratory relief.

2.      The EMMYs consist of not-for-profit charities that are abusing their tax-exempt status to finance a bad-faith "lawfare" attack against independent journalist Jason Goodman and his online talk show entitled *Crowdsource The Truth*.  Since August 2020, the EMMYs have acted in bad faith, first by submitting a meritless copyright complaint to YouTube, then by filing the above-captioned lawsuit, all with the improper purpose of harming Mr. Goodman economically and depriving Mr. Goodman of his YouTube audience during a world-historical election cycle.

3.      The EMMYs are led by Adam Sharp, a left-wing political operative who describes his career as "twenty years at the intersection of media, politics and technology."  Mr. Sharp was installed as CEO of the EMMYs in 2018.  It is believed that Mr. Sharp is personally directing this litigation with the improper purpose of suppressing Mr. Goodman's ability to engage in social and political commentary with which Mr. Sharp disagrees. By engaging in a "lawfare" vendetta against *Crowdsource The Truth*, Mr. Sharp is violating tax law by diverting charitable funds for partisan political purposes.[5]

4.      The EMMYs attempted to use their vastly superior resources to bully Mr. Goodman into servile submission.  Step One:  make a bad faith copyright claim to YouTube that resulted in

---

[5]      By diverting charitable funds for partisan political ends, Mr. Sharp has created tax problems for the EMMYs and its donors.  If Mr. Sharp is using the EMMYs as an instrument to advance a left-wing political agenda, the EMMYs forfeited its tax-exempt status and its donors cannot lawfully deduct contributions to the EMMYs.  This, in turn, may require the EMMYs' donors to amend their own tax returns, insofar as they claimed a deduction for contributions to a non-exempt entity.  Mr. Sharp would be well-served to put his donors on notice of this potential issue by sending them a copy of this pleading.

Mr. Goodman's YouTube channel losing its "Livestream" privileges. Step Two:  file a Federal copyright lawsuit for the purpose of causing YouTube to maintain its sanctions against Mr. Goodman's YouTube channel.  Step Three: implead only Mr. Goodman's company to force Mr. Goodman to pay for corporate legal counsel.  Step Four:  Wait for Mr. Goodman to beg for mercy. Then, the ultimatum:  Mr. Goodman must agree to forfeit his First Amendment rights under the guise of a judicial settlement or he will be bankrupted with legal bills.

5.       The EMMYs' tactics are dishonorable and worthy of rebuke.

6.       YouTube has independently reviewed the EMMYs' underlying copyright complaint and agreed with Mr. Goodman that the EMMYs' complaint was baseless.  Effective October 6, 2020, Mr. Goodman's YouTube channel was restored to full functionality. Additionally, YouTube stated that if Mr. Goodman litigates the matter to judgment in his favor, YouTube will "evaluate further."[6]  The confirmatory email from YouTube is quoted below:

> **From:** YouTube Legal Support Team
> **Date:** October 6, 2020 at 2:28:24 PM EDT
> **To:** jason@21stcentury3d.com
> **Subject: Your letter to YouTube**
> **Reply-To:** YouTube Legal Support Team
>
> Hello,
>
> We received your letter to YouTube regarding your counter notification.
>
> Your ability to live stream has been restored. If this matter resolves with a court judgment in your favor, please feel free to share a copy of the decision with us, and we may evaluate further at that point.

---

[6]       Concurrently with this Answer, Affirmative Defenses, and Counterclaims, the Defendant is filing a partial motion to dismiss / motion for judgment on the pleadings, requesting that the Court dismiss Plaintiffs' First through Sixth Causes of Action.

Thank you,
The YouTube Team

7.      The EMMYs should not be allowed to bully independent content creators who are exercising their God-given right to free speech.  In addition to defending his own interests, Mr. Goodman is prosecuting these counterclaims in order to create a precedent and public record that other New Media independent content creators can look to when they are the victim of similar "lawfare" attacks by large, established interests.

8.      Mr. Goodman looks forward to taking full discovery[7] and presenting his case to a civil jury who will render a verdict that expresses the community's disgust for the EMMYs thuggish tactics against an independent journalist exercising his First Amendment rights.

## CROWDSOURCE THE TRUTH

9.      Counterclaim Plaintiff Jason Goodman is an independent investigative journalist who prides himself on exploring stories and ideas that the Legacy Media won't cover.[8]  Since 2016, Mr. Goodman has produced a running video series called *Crowdsource The Truth*.

10.     Mr. Goodman disseminates his content through a variety of platforms with YouTube being the most important.  Mr. Goodman's YouTube channels have about 140,000 subscribers and 568,000 views in the last month.  Mr. Goodman's guests have included U.S.

---

[7]     Mr. Goodman is not a wealthy person.  He understands that discovery is the most expensive aspect of litigation.  He cannot personally afford to fund the large-scale document review that this case will generate.  Accordingly, Mr. Goodman plans to "Crowdsource" the document review process, enlisting thousands of volunteers to comb through produced documents and identify important items.  This method is the only way that Mr. Goodman can hope to access justice.

[8]     "Legacy Media" and "Corporate Media" refer to the small number of television and print news outlets that dominated the distribution of information from the early 20th century until the mid-2000s.

Senator Marsha Blackburn, Former Acting U.S. Attorney General Mathew Whittaker, Retired NYPD Commissioner Bernard Kerik, Judge Jeanine Pirro, Attorney Alan Dershowitz, and Attorney Sidney Powell.  Mr. Goodman's more popular videos receive hundreds of thousands of views.

11.     Defendant / Counterclaim Plaintiff Multimedia System Design, Inc. is a corporation owned by Mr. Goodman that performs back office functions that support Mr. Goodman's online media business.

12.     Mr. Goodman makes no direct revenue from the videos he posts to YouTube, as his content is not monetized.  *Crowdsource The Truth* is funded by subscribers and supporters who value the content that Mr. Goodman creates.

13.      *Crowdsource The Truth* is based upon a fundamental proposition – that "top-down" systems of information control are obsolete.  The explosion in available data, coupled with accelerating technological progress, have greatly increased the complexity of our social and political problems.  Top-down institutional structures cannot meet the needs of the 2020s.  Our modern world needs to develop a "bottom-up" system for making sense of the world.[9]  That is what *Crowdsource The Truth* is all about.

14.     Mr. Goodman is using social media, mobile data and smartphone technology to produce broadcasts that until only recently would have required large crews and costs thousands of dollars to produce.  Mr. Goodman is working to bring about a world in which individuals have

---

[9]     Our civilization is currently experiencing the upheaval, whereby new technologies are quickly making obsolete a wide range of systems that were invented in the Postwar Era in a very different context.  An excellent description of this phenomenon is entitled "Understanding The Blue Church" by Jordan Hall, available at

https://medium.com/deep-code/understanding-the-blue-church-e4781b2bd9b5

access to the information and technology necessary to break free from mob mentality and think for themselves.

## TELEVISION:  A DYING MEDIUM

15.     The EMMYs are the trade organization for a dying industry.  For decades, the television industry – dominated by a small number of media oligarchs – exercised great influence on American opinion, politics, and statecraft.

16.     In our lifetimes, we have gone from an environment where the Legacy Media Monolith (e.g., NBC, CBS, ABC, Washington Post, New York Times, Wall Street Journal, AP, etc.) could dominate the public agenda, to a completely different media landscape, where the Legacy Media is forced to compete with thousands of independent content creators such as Mr. Goodman.

17.     With the emergence of YouTube and social media, the Legacy Media has lost its influence among wide swaths of the population.  For the first time in human history, people can create a spoken-word video, upload it, and reach an audience of millions.  Independent content creators – such as Crowdsource The Truth – can reach a massive audience at very little overhead expense.

## THE EMMYS LAUNCH A "LAWFARE" ATTACK ON MR. GOODMAN

18.     On June 12, 2020, Mr. Goodman published a 9-minute video that included the Crony Graphic for approximately 10-15 seconds as part of the "pre-show thumbnail image" that appears immediately before the broadcast begins. The Emmy statuette holding a representation of the Covid virus was a lighthearted allusion to a common mispronunciation of "corona virus" made

in context of a parody award show humorously called the "Crony Awards."  A recurring element of Crowdsource The Truth involves humorous graphical juxtaposition of contrasting themes.



19.     According to the EMMYs, on July 28, 2020, someone emailed the EMMYs to complain about *Crowdsource The Truth's* use of the EMMY statuette.  The notion that a random individual would by chance happen upon a relatively obscure YouTube channel, watch a 6-week old video and take umbrage at a fleeting 10-15 second image of the EMMY statuette holding a Covid virus seems improbable.  Nevertheless, that is the EMMYs story.

20.     If the EMMYs were truly aggrieved by *Crowdsource The Truth's* parody, they could have contacted Mr. Goodman at any time and asked him to take it down.  Mr. Goodman would have cooperated for the sake of avoiding needless conflict.

21.     Instead, on or about August 20, 2020, the EMMYs CEO and CEO of pro Democrat Party political consultancy Sharp Things, LLC Adam Sharp personally lodged a frivolous

copyright infringement complaint against Mr. Goodman's YouTube channel. As a consequence of Mr. Sharp's complaint, YouTube issued a sanction on Mr. Goodman's YouTube channel, namely, loss of "live stream" functionality. Livestreamed videos on YouTube attract the largest number of viewers, and as a video gets more views it simultaneously gets recommended more. All video publishers hope to push that chain reaction to the point of going "viral". Liminting Mr. Goodman's rightful access to this livestream functionality badly harmed Mr. Goodman's ability to reach his audience and grow his business.



22.     The day after Mr. Goodman learned of Mr. Sharp's copyright complaint, Mr. Goodman contacted Mr. Sharp at the email address provided by YouTube:

> **From:** Jason Goodman <truth@crowdsourcethetruth.org>
> **Subject: YouTube copyright complait**
> **Date:** August 21, 2020 at 11:38:27 AM EDT
> **To:** asharp@emmyonline.tv
> **Cc:** Camile Bidermann Roizen <cbr@iemmys.tv>
>
> Mr. Sharp,

I have just received notice that you have filed a copyright complaint with YouTube concerning a parody image that appeared in one of our videos. The image in question is a PARODY of the Emmy award statute and as such, you have no legitimate claim of copyright infringement. I am writing to request that you withdraw the copyright complaint immediately as it is having a direct impact on my business that may result in money damages.

Parody relies on the style of the original work and is closely imitated for comic effect and to provide criticism and commentary. This use is 1st amendment protected free speech and is also protected under Section 107 of the Copyright Act which provides for fair use under these specific circumstances. The statue is NOT depicted in its original form holding the Emmy globe but rather has been modified in a transformative way. It is shown holding a representation of a coronavirus particle and this is the essence of the comical criticism and commentary which requires the close imitation of the original for its parody effect. Parody is SPECIFICALLY protected under the digital millennium copyright act, the very same act that protects YouTube from lawsuits from third parties.

Rather than relying on further legal action, I would like to resolve this with you and I am open to discussing options that could include removing the image, the video or other remedies. What is the best way for me to reach you or your legal counsel regarding this matter?

Jason Goodman
323-744-7594

23.     Mr. Sharp never responded to the above email.

24.     After obtaining the telephone number for Sharp Things, LLC from an internet search Mr. Goodman attempted to contact Mr. Sharp by phone, in the hope of resolving the complaint amicably. Mr. Sharp never answered and never responded to Mr. Goodman's voicemails.

25.     It bears emphasis:  the offending image was a parody that appeared for 10-15 seconds as wallpaper before the beginning of a 9-minute video, without any mention of the word EMMYs. Mr. Goodman was attempting in good faith to resolve the dispute amicably, offering to

remove the offending material provided the EMMYs withdraw their YouTube complaint. In a normal business dealing, this problem could have been addressed in a five-minute phone call. Instead, the EMMYs retained counsel and provoked a completely unnecessary dispute.

26. On August 22, 2020, the EMMYs lawyer, Margaret Esquenet, sent an email to Mr. Goodman:

> **From:** "Esquenet, Margaret" <margaret.esquenet@finnegan.com>
> **Subject: Infringement of EMMY Statuette**
> **Date:** August 22, 2020 at 9:15:40 PM EDT
> **To:** "truth@crowdsourcethetruth.org" <truth@crowdsourcethetruth.org>
> **Cc:** "Eichner, Samuel" <Samuel.Eichner@finnegan.com>, "Powell, Virginia" <virginia.powell@finnegan.com>
>
> Dear Mr. Goodman,
>
> We have been retained by The National Academy of Television Arts and Sciences (and its sister entities Academy of Television Arts and Sciences and The International Academy of Television Arts and Sciences) in connection with your correspondence related to your infringement of the EMMY Statuette. We are considering your allegations and will revert by the end of next week.
>
> In the meantime, please immediately cease contacting our clients in any manner.
>
> We understand that you are represented by counsel in legal matters. Your counsel may address all further correspondence to us (contact information below).
>
> Sincerely,
> Margaret Esquenet
>
> **Margaret A. Esquenet**
> Partner
> Finnegan, Henderson, Farabow, Garrett & Dunner, LLP

27.    On August 25, 2020, Mr. Goodman filed a Counter-Notification with YouTube,

explaining why the Crony Graphic was fair use.  YouTube acknowledged receipt thereof:

> Dear Jason Goodman,
>
> Thank you for your counter notification. It has been forwarded to the party that sent the takedown notification.
>
> Keep in mind that by submitting this counter notification, you've initiated a formal legal dispute process. As such, YouTube will handle this process in accordance with the law. This process takes some time, so we kindly ask for your patience.
>
> Upon forwarding your counter notification to the claimant, we will allow them 10–14 business days from this date to respond with evidence that they have taken court action against you to prevent the reinstatement of the video(s) in question.
>
> If we receive no response, after that time period your videos will be restored and the associated penalties on your account will be resolved.
>
> You will receive updates in this email thread about your counter notification's status. You can also check its status within your Video Manager. Though no response is required of you, please respond directly to this message should you choose to provide us with any further information.
>
> - The YouTube Team
>
> Counter-Notification as follows:
>
> Videos included in counter-notification:
>
> http://www.youtube.com/watch?v=MQ2xH7Z3584
>
> Display name of uploader: Jason Goodman
>
> The image in question is a PARODY of the Emmy award statute. The parody relies on the style of the original work and is closely imitated for comic effect and to provide criticism and commentary. This use is 1st amendment protected free speech and is also protected under Section 107 of the Copyright Act which provides for fair use under these specific circumstances. The statue is NOT depicted in its original form holding the Emmy globe but rather has been modified in a transformative way. It is

shown holding a representation of a coronavirus particle this is the essence of the comical criticism and commentary which requires the close imitation of the original for its parody effect. Parody is SPECIFICALLY protected under the digital millennium copyright act, the very same act that protects YouTube from lawsuits originating from third party content. This video MUST be immediately reinstated and the channel must be restored to its full capabilities. Neither YouTube nor the National Academy of Television Arts & Sciences may abuse or ignore the law by removing this video or striking this channel. Reverse this decision immediately.

I swear, under penalty of perjury, that I have a good faith belief the material was removed due to a mistake or misidentification of the material to be removed or disabled.

I consent to the jurisdiction of the Federal District Court for the district in which my address is located, or if my address is outside of the United States, the judicial district in which YouTube is located, and will accept service of process from the claimant.

Jason Goodman

252 7th avenue #6s

New York, NY 10001 US

jason@21stcentury3d.com

2122448585


28.     On August 26, 2020, Mr. Goodman published a conversation between himself and Charles Ortel, wherein Mr. Goodman made reference to the fact that the CEO of the EMMYs had personally "struck" Mr. Goodman's channels on YouTube.  During the course of the August 26 broadcast, Mr. Goodman, speaking without a script, discussed a series of hypotheticals relating to Operation Mockingbird, a program that was officially acknowledged by the CIA in the 1970s.

29.     Here is the verbatim statement of Mr. Goodman (the "Goodman Statement"):

I've been talking a lot about the Emmys lately and how the President of the National Academy of Television Arts and Sciences personally has struck a video on the Jason Goodman YouTube channel that right now is preventing 114,000 subscribers from being notified about this video.  It's going to reduce the number of people who hear your message about Cuomo, who hear Carter Page's message about his book and the things that he was talking about.

And it was a remarkably strategic attack from a guy who used to be a principal of well a highly placed executive at Twitter who was in charge of news politics and elections. Now Twitter ostensibly started as some stupid app on the phone that grew to such prominence.  *But I don't think so.  I think they had designs to do something with it from the beginning.*

And you know Charles, I've, I've, learned something today that I really want to share with everybody that adds even more intrigue to this story. *And I'm not suggesting anything*, but we've spoken about how the president of television's father was a news correspondent for CBS and ABC but I did not realize that he was the individual who told the world that Lee Harvey Oswald is dead.  He was in the Dallas police station when Oswald was shot. And he featured very prominently in the reporting on the JFK assassination.

Now I know a lot of people who watch *Crowdsource The Truth* are aware of the Frank Church Senate hearings where he was investigating the CIA in 1975 or, 1975, well after this.  And William Colby, the director of the CIA, admitted to Operation Mockingbird.  He declassified it.  He said that they were paying news people.  *I don't know if Roger Sharp was named as a participant in that program but it certainly seems curious* and it takes me back to what you were raising about these dynastic families.  *Is this a situation where someone puts pressure on somebody and says look either you can be marginalized and have the 1963 equivalent of your YouTube channel being struck so that you never get off the ground or you can tell stories that we want you to tell you're going to win many Emmys?*  You're going to rise to prominence and maybe someday your son could run the Emmys? *I'm not saying that's what happened.*

But we can hypothesize about a situation where perhaps that would happen and this guy Adam Sharp who struck the channel, he's giving out news Emmys, sports Emmys.  *So I can imagine a world* where a Jason Goodman is working at NBC News reporting on how the Dallas police tested Lee Harvey Oswald's hands and there was no gunshot residue on his face, no indication that he fired a rifle that day.  If Lee Harvey Oswald had

13

ever had a trial and evidence was fairly presented he would have surely been exonerated.  But reporting like this made sure that he's gone down in history as the murderer of JFK and *perhaps* that secret is being jealously protected to this day because disciples of that regime – the Bushes then the Clintons then the Obamas to today need to be protected by these dynastic political and media families.  Because these award shows, that is where the politics of entertainment meet.  ***And I'm just saying there's something to look at here.***

30.     After Mr. Goodman and Ms. Esquenet had an unproductive phone call on August 28, 2020, Ms. Esquenet issued a demand letter containing unreasonable and punitive terms:[10]

CONFIDENTIAL SETTLEMENT COMMUNICATION / INADMISSIBLE FOR ANY PURPOSE

Mr. Goodman,

Following our telephone conversation last week, we discussed your interest in settlement with our clients, the Academies.

As an initial matter, we expect full and complete confidentiality in connection with these settlement discussions, including the contents of this communication.  If you share any of the information in this communication or our settlement discussions, we will consider any such action as a refusal to negotiate settlement and will take any further steps we deem appropriate or necessary to protect our clients' rights.

Our clients will agree to withdraw their DMCA takedown notice to YouTube on the following conditions and subject to the execution of a confidential, formal settlement agreement document drafted by the Television Academies.  Specifically, you must agree to:

First (i.e., before our clients' DMCA takedown notice is withdrawn) withdraw your DMCA counter notification to YouTube;

Cease and permanently desist from any and all use of the all copyright-protected content owned by the Academies and all EMMY® marks,

---

[10]     Ms. Esquenet had no right to unilaterally dictate that a *pro se* adversary maintain secrecy as to her settlement demands. Moreover, the EMMYs, by alleging that Mr. Goodman acted with malice, have made pre-litigation conduct relevant to the merits of the claims.

names, statuettes, etc. (collectively, "Content") in any manner for any purpose, including immediately removing and/or disabling any existing materials, containing any such Content;

Delete all social media posts, blogs, and comments relating to or referencing the Academies, the Content, Adam Sharp, or any other Academies personnel/affiliates, or their family members;

Affirmatively and publicly retract in writing all of your accusations/comments regarding the Academies and Mr. Sharp, and refrain from such activities in the future;

Admit that your use of the EMMY® Statuette constitutes copyright and trademark infringement;

Waive all "parody," "fair use," and other defenses in connection with this matter;

Keep confidential all matters related to this settlement agreement and its provisions;

Accept liability for liquidated damages if you breach the settlement agreement; and

Reimburse the Academies' attorneys' fees in the amount of US $5,000.

We look forward to your early acceptance of these terms.

The foregoing is without prejudice to any right or claim.

Sincerely,
Margaret Esquenet

31.    On September 4, 2020, for the purpose of causing YouTube to continue imposing sanctions on Mr. Goodman's YouTube channel, the EMMYs filed a meritless lawsuit against Mr. Goodman's corporation.   The EMMYs strategically avoided naming Mr. Goodman as a party because they hoped to prevent Mr. Goodman from representing himself *pro se* and thereby inflict significant legal costs on Mr. Goodman.

32.     On September 7, 2020, YouTube advised Mr. Goodman that the above-captioned

litigation had been commenced, and that the restrictions placed on Mr. Goodman's YouTube

channel would remain in place.  YouTube wrote:

> **From:** YouTube Copyright
> **Subject: Re: [TF7M7MGNBZQHLSKXRIRBX2654Y] New**
> **Copyright Counter-Notification**
> **Date:** September 7, 2020 at 11:22:19 AM EDT
> **To:** jason@21stcentury3d.com
> **Reply-To:** YouTube Copyright
>
> Hello,
> Thank you for your counter notification. We have received the attached
> court complaint in regard to this content. Therefore, we regretfully cannot
> honor this counter notification. The content will not be reinstated.
> Please take some time to review our Copyright Tips, as well as the
> copyright-related information available in our Help Center.
> To learn more about copyright, you may also visit YouTube's Copyright
> Center. We unfortunately are unable to assist further in this matter.
>
> Sincerely,
> The YouTube Team

33.     Through counsel, Mr. Goodman engaged with YouTube's legal counsel and

showed them the so-called "infringing" image, explaining why it was fair use.  On October 6,

2020, YouTube rejected the EMMYs' copyright claim and promptly removed all restrictions on

Mr. Goodman's channel.[11]  YouTube added, "If this matter is resolved with a court judgment in

your favor, please feel free to share a copy of the decision with us, and we may evaluate further at

that point."  See Paragraph 6, above.

---

[11]     Concurrently with this Answer, Affirmative Defenses, and Counterclaims, the Defendant
is filing a partial motion to dismiss / motion for judgment on the pleadings, requesting that
the Court dismiss Plaintiffs' First through Sixth Causes of Action.

## DAMAGES

34.     The EMMYs have acted in bad faith, first by making a frivolous copyright complaint to YouTube on or about August 20, 2020; then by refusing Mr. Goodman's offer to discuss an amicable resolution; and finally by filing the above-captioned lawsuit on September 4, 2020.

35.     The EMMYs have pursued this course of conduct for the express purpose of damaging Mr. Goodman's relationship with YouTube, other media platforms, as well as potential subscribers and sponsors.

36.     The EMMYs lawfare attack coincides with the final months of the U.S. Presidential elections.  Independent content creators who produce quality political content have seen enormous growth in subscribers.  From August 20, 2020 to October 6, 2020, due entirely to the EMMYs' now-rejected copyright complaint filed with YouTube, Mr. Goodman's YouTube channels were restricted.  As a consequence, Mr. Goodman's growth was drastically restricted during a key phase of the election campaign.

37.     *Crowdsource The Truth* has been wrongfully deprived of the opportunity to engage and expand its audience for 6 weeks during the home stretch of the most eventful presidential campaign in American history.

38.     Mr. Goodman will seek economic damages in an amount to be determine at trial.

39.     In addition to economic damages, Mr. Goodman has suffered reputational damages as a result of the EMMYs' misconduct in an amount to be determined at trial.

40.     Finally, Mr. Goodman has been forced to incur substantial legal fees and costs associated with the defense of this matter.

## COUNTERCLAIMS

### FIRST COUNTERCLAIM
### Tortious Interference With Business Relations

41.     The preceding allegations are incorporated by reference.

42.     Mr. Goodman has a contractual relationship with YouTube pursuant to which YouTube disseminates Mr. Goodman's content on YouTube's platform.

43.     The EMMYs and its CEO Adam Sharp knew that Mr. Goodman had a contractual relationship with YouTube.

44.     Mr. Sharp, acting in his capacity as CEO of the EMMYs, intentionally interfered with Mr. Goodman's relationship with YouTube by submitting to YouTube a meritless complaint of copyright infringement.

45.     Mr. Sharp had actual knowledge, or with reasonable diligence could have obtained knowledge, that his complaint to YouTube had no merit.

46.     By making a meritless complaint to YouTube, Mr. Sharp and the EMMYs improperly interfered with Mr. Goodman's relationship with YouTube.

47.     The EMMYs' false complaint to YouTube resulted in YouTube suspending Mr. Goodman's access to certain important features including the ability to "live stream" in real time.

48.     Mr. Goodman has suffered damages as a result.

49.     Accordingly, Counterclaim Plaintiffs are entitled to damages to be determined at trial.

## SECOND COUNTERCLAIM
### Tortious Interference With Prospective Business Relations

50.    The preceding allegations are incorporated by reference.

51.    The EMMYs wrongful conduct in filing a frivolous copyright claim with YouTube resulted in YouTube de-ranking Crowdsource The Truth's content.  This, in turn, resulted in Mr. Goodman missing out on the rapid growth that similar YouTube content creators have achieved based on the spike in viewership associated with the 2020 election.

52.    Mr. Goodman had a reasonable expectation of substantially growing his subscriber base during the final weeks of the U.S. presidential election.

53.    Because the profitability of an online news outlet depends upon growing audience engagement, Mr. Goodman had a reasonable expectation that increased viewership and subscribership would benefit Mr. Goodman financially.

54.    The EMMYs were aware that their conduct was inhibiting the growth of Mr. Goodman's YouTube channel.

55.    The EMMYs intentionally interfered with Mr. Goodman's prospective business relationships, including with subscribers, supporters, and sponsors, which were lost as a result of the EMMYs' conduct.

56.    The EMMYs interference was improper.

57.    Mr. Goodman has suffered damages as a result.

58.    Accordingly, Counterclaim Plaintiffs are entitled to damages to be determined at trial.

**THIRD COUNTERCLAIM**
**Declaration That The "Crony" Image Was Fair Use**

59.     The preceding allegations are incorporated by reference.

60.     YouTube's Legal Department has already determined that Mr. Goodman's fleeting use of the Crony Graphic was in compliance with YouTube's terms of service.

61.     The Crony Graphic appeared on a *Crowdsource The Truth* broadcast dated June 12, 2020 for approximately 10-15 seconds as part of the pre-show wallpaper that appears immediately before the broadcast begins.

62.     The use of the Crony Graphic was *de minimis*.   Gayle v. Home Box Office, Inc., No. 17-CV-5867 (JMF), 2018 WL 2059657, at *2 (S.D.N.Y. May 1, 2018).

63.     The use of the Crony Graphic was not commercial in nature, as Mr. Goodman's YouTube channels are not monetized.

64.     The Crony Graphic was in any event fair use.



65.     YouTube has already determined that the Crony Graphic was non-infringing fair use, as evidenced by the fact that YouTube vacated the block on Mr. Goodman's account and reinstated Live Streaming privileges.

66.     YouTube has expressed interest in learning the ultimate judicial resolution of this matter.

67.     There is public interest in obtaining a court ruling as to the fair use of the Crony Graphic.

68.     Accordingly, the Court should declare that Mr. Goodman's use of the Crony Graphic was fair use.

## FOURTH COUNTERCLAIM
### Declaration That Mr. Goodman's Commentary Was Non-Libelous Protected Speech

69.     The preceding allegations are incorporated by reference.

70.     The Goodman Statement, quoted above at paragraph __, is a verbatim transcript of the statement identified by the EMMYs in its complaint at paragraph 43.

71.     The Goodman Statement is a 3-minute snippet of a 100-minute broadcast in which Mr. Goodman and Charles Ortel held an extemporaneous conversation without a script.

72.     Throughout the Goodman Statement, Mr. Goodman makes clear that he is engaging in speculation.  Mr. Goodman phrases his inquiries as rhetorical questions, and in many cases stresses that he is not making any specific assertions.

73.     As a matter of law, the Goodman Statement is non-libelous as a matter of law.

74.     Accordingly, the Court should enter a declaration that the Goodman Statement was non-libelous free speech.

## FIFTH COUNTERCLAIM
## Violation of the New York Anti-SLAPP Law

75.     The preceding allegations are incorporated by reference.

76.     The EMMYs violated New York's Anti-SLAPP law by filing its complaint.  *See*
N.Y. Civ. Rights Law §§ 70-a, 76-a and N.Y. C.P.L.R. §§ 3211(g), 3212(h).

77.     The EMMYs, as a trade group representing the television industry, represents
hundreds of public applicants or permitees.

78.     The EMMYs commenced the above-captioned lawsuit, including a libel claim,
against Mr. Goodman specifically for his commentary about Operation Mockingbird and Roger
Sharp.  Mr. Goodman's news outlet *Crowdsource The Truth* routinely criticizes the television and
film industry and discusses regulatory means of curbing its abuses.

79.     The EMMYs commenced legal action against Multimedia as retribution for Mr.
Goodman raising questions about Operation Mockingbird and Roger Sharp.

80.     The EMMYs' lawsuit was commenced and continued without a substantial basis in
fact and law and could not be supported by a substantial argument for the extension, modification
or reversal of existing law.

81.     The EMMYs' lawsuit was initiated for the sole purpose of harassing, intimidating,
punishing or otherwise maliciously inhibiting the free exercise of speech, petition or association
rights.

82.     Accordingly, the EMMYs are liable for legal fees and costs, compensatory
damages, and punitive damages.

## SIXTH COUNTERCLAIM
### Malicious Prosecution / Abuse of Process

83.    The preceding allegations are incorporated by reference.

84.    The EMMYs filed the above-captioned lawsuit for the ulterior motive of damaging Mr. Goodman's business by causing his YouTube channel to be sanctioned on the basis of a spurious copyright complaint.

85.    The EMMYs made use of the legal process (filed the complaint in this action) for the improper purpose of preventing Mr. Goodman's YouTube channel from being reinstated.

86.    Mr. Goodman has suffered damages as a result of the EMMYs' wrongful conduct.

87.    The EMMYs are liable to Mr. Goodman and Multimedia in an amount to be determined at trial.

### PRAYER FOR RELIEF

Counterclaim Plaintiffs demand damages and declaratory relief as set forth above, and such other relief as the Court may deem just and proper.


Dated:        New York, New York
              October 13, 2020

                                          JOHN H. SNYDER PLLC

                               By:  _____
                                          John H. Snyder
                                          555 Fifth Avenue, Suite 1700
                                          New York, New York 10017
                                          Tel:  (917) 292-3081
                                          Email:  john@jhs.nyc