UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---------------------------------------------------------------X
THE NATIONAL ACADEMY OF
TELEVISION ARTS AND SCIENCES, INC.
and ACADEMY OF TELEVISION ARTS &
SCIENCES,

                Civil Action No. 1:20-cv-07269 (VEC)

          Plaintiffs,

       -v-

MULTIMEDIA SYSTEM DESIGN, INC.
d/b/a "CROWDSOURCE THE TRUTH",

          Defendants.
---------------------------------------------------------------X

# MEMORANDUM OF LAW IN OPPOSITION
# TO MOTION TO DISMISS COUNTERCLAIMS

February 26, 2021

                                JOHN H. SNYDER PLLC
                                555 Fifth Avenue, Suite 1700
                                New York, NY 10017
                                Tel:  (212) 856-7280
                                Fax:  (646) 304-9230
                                *john@jhs.nyc*

## **TABLE OF CONTENTS**

          Page

INTRODUCTION ..............................................................................................................................1

    A.   *Crowdsource The Truth* Was Right ..............................................................................1

    B.   The Lawfare Attack on Mr. Goodman ..........................................................................2

    C.   Discovery Will Be Critical ............................................................................................3

ARGUMENT ....................................................................................................................................4

    I.   Goodman and Multimedia Have A Valid Counterclaim Under DMCA § 512(f) (Seventh Counterclaim) ..................................................................................5

    II.   The Amended New York anti-SLAPP Law Applies  (Fifth Counterclaim) ........................6

    III.   The Declaratory Relief Counterclaims Are Appropriate  (Third and Fourth Counterclaims) ...................................................................................................................9

    IV.   Duplicate Claims Are Withdrawn  (First, Second, and Sixth Counterclaims) ..................................................................................................................10

CONCLUSION ................................................................................................................................10

Counterclaim Plaintiffs Multimedia System Design, Inc. ("Multimedia") and Jason Goodman ("Goodman") respectfully submit this memorandum in partial opposition to the motion to dismiss submitted by Counterclaim Defendants, the Television Academies.  *See* Television Academies' Moving Brief, Docket No. 46

## INTRODUCTION

A.   *Crowdsource The Truth* Was Right

Jason Goodman is a journalist and YouTube personality who publishes an online broadcast known as *Crowdsource The Truth*.  His YouTube channels have over 100,000 subscribers and his broadcasts (often several per day) typically receive several thousand views.  Mr. Goodman earns a living through the voluntary sponsorship of his viewers.

During the COVID lockdown, Mr. Goodman's popularity grew as he provided first-hand, on-the-street reporting in New York that nobody else was offering.  Mr. Goodman has drawn flak because he questioned the "hero" narrative promoted by Governor Andrew Cuomo and his fans in the media:

>https://youtu.be/zAVIUBJ1SEQ
>
>https://youtu.be/Xp2hVSUU0uo
>
>https://youtu.be/ugwBnaiwBk8
>
>https://youtu.be/StVLokuOyQ8

In a bygone age when news organizations challenged the official narrative instead of stamping out dissent, Mr. Goodman would be awarded an EMMY for his original and important "on-the-street" reporting on the COVID pandemic.  Instead, perversely, the Television Academies' sought to destroy Mr. Goodman's ability to report the news, even while allowing its international affiliate to award its coveted Founder's Award EMMY to Governor Cuomo.

In their Complaint, the Television Academies accuse Mr. Goodman of spreading "dangerous misinformation" about COVID. *Id.* at ¶ 31. Ironically, we learned in late January 2021 that Emmy Award Winner Governor Cuomo was actually the one spreading misinformation about the number of deaths in nursing homes. According to the *New York Times* and Attorney General Letitia James, the Cuomo administration under-reported nursing home deaths by as much as 50%.[1] Mr. Goodman has been proven right in questioning Governor Cuomo. Shame on Mr. Adam Sharp for trying to banish Mr. Goodman from the marketplace of ideas.

B.     The Lawfare Attack on Mr. Goodman

There is no dispute that Mr. Goodman made use of the Emmy Statuette in his June 12, 2020 broadcast. Mr. Goodman routinely creates fair use parodies of copyrighted imagery, juxtaposes them with ironic or comical images for editorial effect, and publishes them as "thumbnail" graphics. A review of YouTube confirms that countless other YouTubers routinely engage in identical "fair use" every day. Mr. Goodman has been engaging such fair-use for years without objection.

On August 20, 2020 (more than two months after the June 12 broadcast) and without any notice, the Television Academies' CEO Adam Sharp lodged a "copyright strike" against Mr. Goodman's YouTube channel, resulting in Mr. Goodman's YouTube channel being restricted from live broadcasting for 90 days. This, in turn, harmed Mr. Goodman's ability to reach his audience causing a direct negative impact on his income. Those who make a living on social media understand that lodging a copyright strike against a content creator (without first attempting to resolve the issue informally) is a hostile act. Mr. Sharp knows this. A former Twitter executive,

---

[1] https://www.nytimes.com/2021/01/28/nyregion/nursing-home-deaths-cuomo.html

https://ag.ny.gov/press-release/2021/attorney-general-james-releases-report-nursing-homes-response-covid-19

Mr. Sharp maintains his own YouTube channel with footage of his father's work that includes the following notice:

> All broadcast clips are the intellectual property of their respective networks and/or stations, and are believed to be used here under the fair use and library/archive exceptions to U.S. copyright law. ***If you are the proper copyright holder of any of these works and object to my use of them, please contact me.***

Had Mr. Sharp simply contacted Mr. Goodman and asked him to remove the offensive image, Mr. Goodman would have immediately honored that request specifically to avoid a potential copyright strike. Instead, Mr. Sharp attacked Mr. Goodman's livelihood and lodged a copyright strike with YouTube, seemingly without consideration of whether Mr. Goodman's use was "fair use." When Mr. Goodman did not immediately accede to punitive settlement demands, the Television Academies commenced this lawsuit. The Television Academies have now spent (undoubtedly) hundreds of thousands of dollars waging Lawfare against Jason Goodman.

### C. Discovery Will Be Critical

The Parties are currently engaged in document discovery. The Counterclaim Plaintiffs produced their documents on February 24, 2021. On the other hand, the Television Academies have not yet produced anything. Our requested discovery is expected to shed light on the questions of why Mr. Sharp filed the copyright strike on August 20, 2020 as well as whether he had a good faith basis to believe that Mr. Goodman's use was not "fair use." We will also explore these issues with Mr. Sharp during his deposition.

Even without the benefit of discovery, facts exist that suggest the Television Academies asserted their copyright claims in a highly aggressive fashion, and in bad faith, because the Television Academies (or someone else) didn't like Mr. Goodman's message and wanted to silence his voice.

- The Television Academies resisted attempts at informal resolution, suggesting that they were more interested in harming Mr. Goodman than protecting their copyright. *See* Amended Counterclaims, pp. 22, ¶ 47-53.

- The Television Academies have never filed a similar suit against anybody else, despite countless examples of the EMMY Statuette being used in similar settings. *See* Amended Counterclaims, pp. 18-21, ¶ 40.

- In addition to being the CEO of the Television Academies, Adam Sharp is a political operative who leverages the EMMYs to promote his own consulting practice, which he describes as being "at the intersection of media, politics and technology."[2] Amended Counterclaims, p. 2, ¶ 3.

- The Television Academies (which are tax-exempt charitable entities) have spent large amounts of money pursuing a case against an obscure YouTuber with no discernable monetary or strategic upside.

- The Television Academies and their international affiliate played a major role in burnishing the public image of Governor Cuomo. Amended Counterclaims, p. 17, ¶ 39.

- Mr. Goodman has been the target of repeated Lawfare attacks from other parties (some of which the Court is familiar with) which seem to be aimed at exhausting Mr. Goodman's time and resources.

## ARGUMENT

The Counterclaim Plaintiffs have asserted Seven Counterclaims: (1) tortious interference with contract; (2) tortious interference with prospective relations; (3) declaration of fair use; (4)

---

[2] Mr. Sharp's consulting practice can be found here: https://sharpthings.io/

declaration that speech was non-libelous; (5) anti-SLAPP; (6) abuse of process; and (7) abuse of the DMCA.

## I. Goodman and Multimedia Have A Valid Counterclaim Under DMCA § 512(f) (Seventh Counterclaim)

The Counterclaim Plaintiffs' Seventh Counterclaim states a valid claim under Section 512(f) of the Digital Millennium Copyright Act (DMCA). *See* Amended Counterclaim, ¶¶ 104-107, pp. 29-30. Under Section 512(f) of the DMCA, if a party "knowingly materially misrepresents" that the material or activity it complained of is infringing, it may be subject to liability for "any damages, incurred by the alleged infringer by any copyright owner ... who is injured by such misrepresentation." *Id.* § 512(f). However, a party has not infringed on a copyright if their use constituted fair use under 17 U.S.C. § 107. *See Johnson v. New Destiny Christian Ctr. Church, Inc.*, 826 F. App'x 766, 771 (11th Cir. 2020). *See also Lenz v. Universal Music Corp.*, 815 F.3d 1145, 1153 (9th Cir. 2016) ("a copyright holder must consider the existence of fair use before sending a takedown notification under § 512(c).").

The Counterclaim Plaintiffs allege that the Television Academies filed their takedown notice in bad faith and without adequately considering the existence of fair use. *See* Amended Counterclaim, ¶ 2 ("Since August 2020, the EMMYs have acted in bad faith, first by submitting a meritless copyright complaint to YouTube, then by filing the above-captioned lawsuit, all with the improper purpose of harming Mr. Goodman economically and depriving Mr. Goodman of his YouTube audience during a world-historical election cycle."); ¶¶ 47-48 ("The EMMYs have acted in bad faith, first by making a frivolous copyright complaint to YouTube on or about August 20, 2020; then by refusing Mr. Goodman's offer to discuss an amicable resolution; and finally by filing the above-captioned lawsuit on September 4, 2020. The EMMYs have pursued this course of conduct for the express purpose of damaging Mr. Goodman's relationship with YouTube, other media platforms, as well as potential subscribers and sponsors."); ¶¶ 57-58 ("Mr. Sharp, acting in his capacity as CEO

5

of the EMMYs, intentionally interfered with Mr. Goodman's relationship with YouTube by submitting to YouTube a meritless complaint of copyright infringement, trademark infringement, and defamation. Mr. Sharp and the Television Academies had actual knowledge, or with reasonable diligence could have obtained knowledge, that his complaint to YouTube had no merit."); ¶ 80 ("YouTube has already determined that the Crony Graphic was non-infringing fair use, as evidenced by the fact that YouTube vacated the block on Mr. Goodman's account and reinstated Live Streaming privileges.").

Under Section 512(f) of the DMCA, the Counterclaim Plaintiffs are entitled to take discovery that will show whether the Television Academies engaged in a good faith inquiry regarding fair use before filing the DMCA takedown notice on August 20, 2020. If a jury finds that the Television Academies acted in bad faith in lodging their takedown notice (including by failing to adequately consider fair use), the Television Academies will be liable to the Counterclaim Plaintiffs for damages.

The Television Academies' motion to dismiss the Seventh Cause of Action, arising under DMCA § 512(f), should be denied.

## II.   The Amended New York anti-SLAPP Law Applies (Fifth Counterclaim)

The Television Academies' have asserted a meritless defamation claim against Mr. Goodman, who was engaged in public advocacy. By filing this defamation claim (sounding in New York state law), the Television Academies triggered New York's newly amended anti-SLAPP law.

The Television Academies incorrectly rely upon *La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020) for the proposition that New York's anti-SLAPP law "is inapplicable in Federal court." *See* Mem. at 20-22. The *La Liberte* case involved portions of the California anti-SLAPP law which were deemed to be "procedural" in nature and therefore not applicable in Federal Court.

On November 10, 2020, Governor Cuomo signed into law an amendment to the New York anti-SLAPP law. In what appears to be the only case addressing the issue, on December 29, 2020,

6

Judge Rakoff considered the application of the newly amended New York anti-SLAPP law. In *Palin v. New York Times Co.*, No. 17-CV-4853 (JSR), 2020 WL 7711593, at *3 (S.D.N.Y. Dec. 29, 2020), the Court held:

> It is undisputed that § 76-a requires public figures, like plaintiff, to prove actual malice by clear and convincing evidence. **It is also undisputed (albeit by virtue of neither party having raised the issue) that a federal court sitting in diversity must apply § 76-a because it is a substantive, rather than a procedural, provision.** See Adelson v. Harris, 774 F.3d 803, 809 (2d Cir. 2014) (affirming the district court's application of certain substantive provisions of Nevada's anti-SLAPP law); see also La Liberte v. Reid, 966 F.3d 79, 86 n.3 (2d Cir. 2020) (distinguishing between the applicability in federal court of substantive and procedural elements of state anti-SLAPP laws). The only question here is whether § 76-a should be given retroactive effect to this action, which was filed before the amendments took effect but has not yet gone to trial. . . .
>
> **It is clear that § 76-a is a remedial statute that should be given retroactive effect.** The Legislature conveyed a sense of urgency by directing that the amendment was to "take effect immediately." See A.B. 5991-A § 4; see, e.g., Gleason, 96 N.Y.2d at 122, 726 N.Y.S.2d 45, 749 N.E.2d 724. Moreover, the legislative history demonstrates that the amendments to § 76-a were intended to correct the narrow scope of New York's prior anti-SLAPP law. . . .

*Id.*, emphasis added.

The amended New York anti-SLAPP law makes three (3) changes to New York law that are relevant to the Counterclaim Plaintiffs' claims. All of these changes are substantive, in that the new anti-SLAPP law:

- Expands the statute beyond actions "brought by a public applicant or permittee," to apply to any action based on a "communication in a . . . public forum in connection with an issue of public interest" or "*any other lawful conduct in furtherance of the exercise of the constitutional right of free speech in connection with an issue of public interest, or in furtherance of the exercise of the constitutional right of petition*."

- Confirms that "public interest" should be construed broadly, including anything other than a "purely private matter."

7

- Alters the formerly permissive standard ("may") for awarding attorneys' fees to provide that where the court grants such a motion, an award of fees and costs is mandatory: *i.e.*, "costs and attorney's fees *shall* be recovered."

In *Bongino v. Daily Beast Co., LLC*, 477 F. Supp. 3d 1310, 1322–23 (S.D. Fla. 2020), the Court determined that the Florida anti-SLAPP law's "fee shifting" provision was substantive, not procedural, and therefore would be applied by the Federal court.

> That brings the Court to the second question regarding Florida's anti-SLAPP statute: whether its fee-shifting provision applies in a federal court exercising diversity jurisdiction. As far as the Court is aware, the Eleventh Circuit has not addressed this question. So, this is a matter of first impression.
>
> In such a case, a federal court will not apply a state statute that "answers the same question" as a Federal Rule of Civil Procedure. *See Carbone v. Cable News Network*, 910 F.3d 1345, 1349 (11th Cir. 2018) (addressing whether Georgia's anti-SLAPP statute applies in federal court) (quotation and citation omitted).
>
> The Eleventh, Fifth, D.C., and now Second Circuits agree: certain states' iterations of the anti-SLAPP statute "answer the same question" as Federal Rules of Civil Procedure 8, 12, and 56. *See Carbone*, 910 F.3d at 1357 (11th Cir. 2018)(Georgia); *La Liberte v. Reid*, 966 F.3d 79, 85–86 (2d Cir. 2020) (California); *Klocke v. Watson*, 936 F.3d 240, 245 (5th Cir. 2019) (Texas); *Abbas v. Foreign Pol'y Grp., LLC.*, 783 F.3d 1328, 1334 (D.C. Cir. 2015) (D.C.).
>
> Those statutes conflict with the Federal Rules of Civil Procedure because they raise the bar for a plaintiff to overcome a pretrial dismissal motion. *See Carbone*, 910 F.3d at 1350, 1356 (addressing Georgia's anti-SLAPP statute, which requires the "plaintiff to establish 'a *probability*' that he 'will prevail on the claim' asserted in the complaint"); *La Liberte*, 966 F.3d at 87 (addressing California's anti-SLAPP statute, which requires "dismissal unless the plaintiff can 'establish a probability that he or she will prevail on the claim' "); *Klocke*, 936 F.3d at 246 (addressing Texas's anti-SLAPP statute, which requires " 'clear and specific evidence' that a plaintiff can meet each element of his claim"); *Abbas*, 783 F.3d at 1333 (addressing D.C.'s anti-SLAPP statute, which requires dismissal when the "plaintiff does not have a likelihood of success on the merits").
>
> Not so for Florida's anti-SLAPP statute. *See* Fla. Stat. § 768.295(4). Instead, it fuses with Rules 8, 12, and 56 by entitling the prevailing party to fees and costs if, after invoking the devices set forth by those rules, a court finds an action is "without merit" and thus prohibited. *Id.* To be sure, Florida's statute authorizes the use of

8

procedural mechanisms—the filing of a motion to dismiss or a motion for final or summary judgment. *Id.* And it establishes that the moving party has the "right to an expeditious resolution" of those motions. *Id.* But it does not require the plaintiff "to establish 'a *probability*' that he 'will prevail on the claim' asserted in the complaint." *Carbone*, 910 F.3d at 1350 (quoting O.C.G.A. § 9-11-11.1(b)(1)) (explaining why Georgia's anti-SLAPP statute clashes with Rules 8(a) and 12(b)(6)). Nor does Florida's statute contemplate "a substantive, evidentiary determination of the plaintiff's probability of prevailing on his claim." *Id.* at 1350–51 (citation omitted) (explaining why Georgia's anti-SLAPP statute collides with Rule 56). At bottom, Florida's statute is a garden variety fee shifting provision, which the Florida legislature enacted to accomplish a "fundamental state policy"—deterring SLAPP suits. Fla. Stat. § 768.295(1). The result is a statute that does not "answer the same question" as the Federal Rules. *Shady Grove Orthopedic Associates, P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 401, 130 S.Ct. 1431, 176 L.Ed.2d 311 (2010).

Counterclaim Plaintiffs respectfully suggest that the *Palin* and *Bongino* cases are well-reasoned and correctly decided. Under these authorities (and other cases cited therein), the provisions of the amended New York anti-SLAPP law that define its own scope and makes fee shifting mandatory are substantive, and therefore fully applicable in this case. Moreover, for the reasons articulated by Judge Rakoff in the *Palin* case, New York's amended anti-SLAPP law is applicable retroactively. The Television Academies' motion to dismiss the Fifth Counterclaim should be denied.

### III. The Declaratory Relief Counterclaims Are Appropriate (Third and Fourth Counterclaims)

Counterclaim Plaintiffs have asserted causes of action seeking a declaration that their use of the Crony Graphic was fair use (Third Counterclaim); and Mr. Goodman's challenged statements were non-defamatory (Fourth Counterclaim). We included these requests for declaratory relief as stand-alone claims for a technical reason – to assure that the Television Academies could not "moot" our discovery (or avoid a decision on the merits) by strategically withdrawing claims.

We agree with the Television Academies' general observation that Courts have considerable discretion over whether to exercise declaratory jurisdiction. Under these circumstances, the Court should permit the Counterclaim Plaintiffs to make sure we are able to obtain a decision on the merits.

### IV. Duplicate Claims Are Withdrawn (First, Second, and Sixth Counterclaims)

Counterclaim Plaintiffs have considered the Television Academies' arguments with respect to the First, Second, and Sixth Counterclaims. We agree that the tortious interference and "abuse of process" claims are mostly or entirely duplicative of the DMCA § 512(f) claim. In order to streamline the claims and avoid duplication, Counterclaim Plaintiffs withdraw the First, Second, and Sixth Counterclaims without prejudice.

### CONCLUSION

Wherefore, the Counterclaim Plaintiffs request that the Court enter an order deeming the First, Second, and Sixth Counterclaims withdrawn without prejudice, and otherwise deny the Television Academies' motion to dismiss.

Dated:   New York, New York
         February 26, 2021

                                    JOHN H. SNYDER PLLC

                            By:  _____
                                    John H. Snyder
                                    555 Fifth Avenue, Suite 1700
                                    New York, New York 10017
                                    Tel: (917) 292-3081
                                    Email: john@jhs.nyc